May it please the court, my name is Dennis Charney. I represent Mr. Huitt. If you'll bear with me, I'm on the tail end of a cold here, so I'll try and work through it as best I can. There are several arguments that have been advanced in the briefing that, some of which I will go ahead and submit on the briefing. The primary issue that I wanted to discuss at oral argument today has to do with the search warrant execution and primarily the affidavit, not the execution, the affidavit in support of the search warrant. This court, I believe in 1991, decided United States v. Weber, which essentially sets forth that an affidavit must set forth some foundation demonstrating that an individual is a member of a particular class if the government is going to rely on such a classification of an individual in support of a search warrant. In the Weber case, I think that a logical extension from the Weber case is that statements made by government agents in support of search warrants themselves must contain some measure of foundation and should set forth facts which, if we were to apply Rule 56C from the civil rules, set forth facts which would otherwise be admissible in evidence. Now, we don't carry that quite to that extension because we allow agents to put hearsay statements and essentially to discuss the background of their investigation in the affidavits. But if they're going to move into the realm of expertise in particular areas, it would be Mr. Hewitt's position that, in fact, the affidavit should set forth a sufficient foundation upon which the agent or the affiant in this particular agent or affiant is basing their opinion in support of the request for a search warrant. Counsel, is it your argument that the search warrant affidavit in this case was more similar to the one in the Weber case than, for instance, in the Hay case? With respect to the classification of the individuals, yes. I would submit that it was similar to the affidavit in the Weber case in that it discussed the nature and general characteristics of sex offenders and, in particular, child pornographers, collectors of child pornography and the like, but really didn't set forth any foundation upon which Agent Martin was basing this opinion. If we take out the information in this affidavit, the Hewitt affidavit, regarding sex offenders or pedophiles, is there enough in there nevertheless to sustain the search warrant? Well, Your Honor, you got right down to the bottom of my argument. Cut to the chase. I expedite this argument right away because it says, right now, what do we do? In discussing just that portion plus the other objectionable portions, the way that I was going to invite this Court to analyze this case is to do exactly that, which is to excise from this search warrant affidavit everything that should not come in. Well, tell me specifically what portion of the affidavit you assert discussed the general description of proclivities of pedophiles. Where is that exactly in the affidavit? It's in my Excerpts of Record, Volume 2, Tab 29. Okay. All right. We have a portion at page 6 of the search warrant affidavit entitled, Background on Computers in Child Pornography. Well, is that discussing the general proclivities of pedophiles? It does to a certain extent. It talks about how child pornographers can transfer things that child pornographers are doing. Page 7, for example, discusses how collectors and distributors of child pornography use online resources. But is that the same as the information that was held to be objectionable in Weber? No. It's slightly different because I don't think that the Internet had really become the, I guess, the medium of choice for child pornographers at that point in time. But the Weber case was talking more about child pornographers and how they will store and cache, well, cache is probably more of a computer word, but they'll store and archive their pornography in places. They don't want to let go of it, things along those lines. Well, in Weber, the court noted that the description of the proclivities was several pages of the affidavit. And it purported to be based on experience and training in child pornographers. And we don't have anything of that nature here, I mean, in terms of pages and pages of proclivities. Well, we have, beginning at page 10 of the search warrant affidavit, a pretty significant section entitled Child Pornography Collector Characteristics. And that goes half of page 10, all of page 11. And interwoven throughout the affidavit is other information about what child pornographers do and don't do. And interestingly, the affidavit never ties any of this to either Mr. Hewitt or any of the members of his family. Well, let's just cross all that out and get down to Judge Rawlinson's bottom line question. Yes. Let's just assume we should cut that out. Okay. All right? So we do that. I'll assume, for purposes of discussion, let's get down to the nitty-gritty, as Judge Rawlinson said. Okay. And respond to her question, which was, why isn't the balance, when Martin gets into the background investigation and goes through all the detail, why isn't that sufficient to show probable cause if there's a fair probability? And I guess where I come to is the point where we get to page 13 of the affidavit, background of the investigation. Everything here, perfectly acceptable. Perfectly acceptable. We have pages 13 through, I believe, 17, maybe, I'm sorry, through page 19, which contains Agent Martin's observations, the things she did, the things she saw, the cyber thefts she collected, which is well within the parameters of that which we can find acceptable in a search warrant affidavit. But what my argument is is that if we just look at that, if we excise out all the stuff about computers that she admitted at trial that she really doesn't know, if we excise out the other information, the background of the investigation portion of this affidavit, in my view, would not be sufficient to go into the home to take out every single computer, every single hard drive, every single peripheral, well, they didn't actually take the router, but essentially to take every single item out of the Hewitt home. Why not? Why not? What case authority most closely resembles this and supports your argument that the search warrant affidavit, shorn of the general proclivity matters, would be insufficient? What case authority are you relying on to support your argument that this is an insufficient affidavit? Only that case authority which is listed in the briefing that was supplied. What's your strongest case? What's your strongest case that supports your argument that this affidavit is insufficient if you take out the Weber considerations? If we take out the Weber considerations, I believe that the strongest case that we had cited with respect to the search warrant, just one moment, I'm sorry. The worst fear of any lawyer is dead silence at oral argument, Your Honor. I'm having trouble putting my fingers on the one. Maybe you can do it on my desk. Well, yes, on my rebuttal. You said, does your answer suggest that you could have taken at least one computer? I think what it suggests is that perhaps what was needed was additional information to further narrow down who or which computer was specifically involved. For example, when we talk about this issue on the distribution up to this particular page, there wasn't any evidence presented to the magistrate that the images had moved from a computer in the Hewitt home to the Yahoo Group's photo album that was posted online. That was evidenced at trial, for example. So there was no evidence along those lines within which to support a search warrant to take down the computers in the entire home. So essentially what I'm saying is if we do look at the background of the investigation portion, I don't believe that it was sufficient to go in and take everything out of that particular residence at that point in time. But there was not enough probable cause presented to the magistrate at that point to support that probable cause finding. Now, moving to briefly the issue of the distribution and the sufficiency of the evidence, we have presented this court with excerpts of transcripts and the like regarding the distribution count, which I think is the most problematic from the government's perspective. The evidence in this case is pretty telling with respect to the fact that there were certainly images of sexually exploitative nature on computers within the Hewitt home. However, if we look at the record as a whole, there is not a shred of evidence in the record to indicate who, how, or even if, and that's an important one to be answered by, I believe, Detective Bukasic and Agent Martin at trial, or even if images were placed on the publicly viewed Yahoo page from the Hewitt home to Yahoo, that there's no upload log, there's no evidence, no indication whatsoever, and in a record that is completely devoid of any evidence whatsoever as to how the pictures got there, I think that the distribution count needs to be dismissed. Counsel, wasn't this tried to a jury? It was. Did you try this case? I did. And so the jury, based on the evidence that was presented, rendered a verdict. It did. And so are you saying that there was not sufficient evidence to support the jury's verdict on that count? I am. And I'm saying that it is a rare case where an appellate court is going to look at the evidence independently and look it over. But I guess what I would suggest is that in cases of this nature, I'm not asking for a particularly higher level of scrutiny, but these are the cases that really, really upset jurors and other individuals. But they have to be viewed in the same light as any other case. And when we do look at this case. Did you do a Rule 29 motion? I did. And the district court judge then looked at the evidence after the jury did. He did. So it wasn't just the jury being upset about the evidence. The judge also looked at the evidence that was presented to the jury and found that it was sufficient to support the jury's verdict. Yes, Judge Wendell did. Are you asking us to say that the jury was wrong and the district court judge was wrong? I am. Sort of a third jury, if you will, perhaps, of my final point. Somewhat academic, though, in the end, because even the government agrees on the double jeopardy claim. We demand for the district court to set aside one of these counts. He's talking about the distribution claim. I was talking about the distribution claim. I think that the distribution claim, if we look at the complete vacuum of evidence that exists in this case as to the distribution claim, there really is no evidence in the record to show how those images found their way from or basically how those images found their way to the Yahoo publicly viewed page. Finally, on the double jeopardy argument, I'm going to – I suggested in the briefing that the court basically pick or choose one of the two counts to dismiss. I'm going to ask the court, and I don't know if the government will stipulate that you reverse on the receiving and that we will then remand to the district court for resentencing on the two counts, assuming that the court rejects the arguments I've presented. I'd like to reserve my balance. Counsel, I know you probably have an auto presentation, but just because this is fresh in my mind, would you please address opposing counsel's representation that the evidence was insufficient to support the distribution count because there was absolutely no evidence presented regarding uploading the pornographic images to the Yahoo. Thank you, Your Honor. Good morning. May it please the court, my name is Wendy Olson. I'm with the U.S. Attorney's Office for the District of Idaho, and I was trial counsel below as well. And I had planned on addressing in oral argument two areas, the sufficiency of the evidence argument and the prosecutorial misconduct claims. And I will, in light of Mr. Charney's arguments, address as well whether the search warrant affidavit established probable cause to search and seize all of the computers that were located in the Hewitt home on December 9th of 2005. With respect to the sufficiency of the evidence, Your Honor, with respect to count one, the distribution count, and I think this is really something that goes to both of the issues I intended to address, the sufficiency of the evidence and prosecutorial misconduct. I'd say there's a fundamental disagreement between myself and Mr. Charney as to the strength of the government's evidence on that count, the distribution count. I would submit that there was strong, strong circumstantial evidence that the defendant is the one who uploaded 85 images, including what turned out to be 8 images of identifiable or admitted child pornography from the defendant's Antec computer to the Yahoo website where it was seen in August of 2005 by Courtney Beard, the FBI analyst assigned to the National Center for Missing and Exploited Children. Now, Mr. Charney focuses on the fact that there was no evidence of an upload, and I would submit that there doesn't need to be specific evidence of an upload of the specific manner of distribution. I would submit that there is, because the evidence, I think it's clear, strong, and unrefuted, that all 85 images that ended up on that Yahoo webpage were found on the defendant's Antec computer in the same drive-and-file structure. They were in the drive-and-file structure that was Chris, my documents, my pictures, all 85. All 85, including the images of child pornography, had created dates, meaning they were first on that part of the computer prior to June 5th of 2005, which is the date that was on that Yahoo photos page. I would submit that where there is evidence that all of the images, including the images of child pornography, are in one place first, and then they end up being in another place subsequent to that, that that is sufficient circumstantial evidence that a distribution occurred from the Antec computer to the Yahoo photos webpage. On top of that, Your Honors, there is, the Yahoo photos webpage had on it said Voyager 83700, not created by Voyager 837009, so that's the clue as to who that webpage belonged to. So once you take those two pieces of evidence, I guess, where they existed first and where they ended up, the question becomes who put them there? Who did that distribution? And I would agree with Mr. Charney, and to answer your question directly, Your Honor, there was no specific, there are no upload logs, and that I don't think that there needs to be. Judge Windmill rejected that in denying the motion for a new trial, and agreed that all you needed was that, or it was sufficient, rather, to have that circumstantial evidence showing that they were in one place first, and then on the Yahoo webpage second. In addition, Your Honor, there was evidence with one of the NCPIC report cyber tips that two of the items were uploaded on June 5th of 2005. And when you add that into the equation, I think. How did they testify? What was the evidence that showed that they had been uploaded on that? Well, Your Honor, there was a stipulated exhibit that the tip to, I mean it was not a forensic computer exam, or if that's where you're getting it. It was a stipulated exhibit where it said on the cyber tip that those images had been uploaded to the webpage. That was the evidence that was presented there. Assuming they're people who monitor the pages, and they can determine when something pops up on the. . . In that particular case, there was, Your Honor, and as the court might recall from some of the other arguments I submitted in my briefing, the details I went over, this case did not start, the investigation did not start with the location of this webpage that had the child pornography on it. It started because there are people who are sort of, I guess, private sleuths, or like the Dateline folks who invite people on the internet who are soliciting minors, and who do monitor some of these chat rooms, and when they see evidence or see chats that suggest that someone is preying on minors, then they report that to the National Center for Missing and Exploited Children. And in this particular case, beginning in January of 2005, there were what they called cyber tips related to the National Center for Missing and Exploited Children, that a person first with the screen name Voyager 83709, and then a little while later, a second screen named Voyager 837009, a second zero, was online, very graphically soliciting others to contact Voyager if they were interested in the violent sexual assault of children. And that's what got NCVIC focused initially on this particular screen name or identity, and then looking into that person further. And I think you're going to want, this, as I said, is a circumstantial case. I think it's a strong circumstantial case. Once you have the inference or anything, and I think it's a reasonable inference, and say, yes, that's proof that they were distributed from the ANTEC computers to the web page, then the question becomes, who was Voyager 83709? Who was Voyager 837009? And I would submit to you that all of the evidence that came in at the trial that pointed to a specific individual, pointed to this defendant, Chris Hewitt, and to nobody else. There was lots of evidence from the ANTEC computer itself and from some of the other computers within the Hewitt home that Voyager 83709 was Chris Hewitt. There were a series of screen names that went on over time, all of which connected to the e-mail address J6HTB at AOL.com. And there were other items on the computer that the government's forensic expert found that identified Chris Hewitt as having that particular e-mail address. They were unrelated to any of the child pornography or the explicit chats. For example, there was, I think, a bank account statement. There was a resume. There were e-mails to friends. And some of those hooked Chris Hewitt and the J6HTB at AOL.com e-mail up again to the screen names, Voyager 837009, Voyager 83709. And I think, frankly, Your Honor, that that evidence that that's who he was and that all of those screen names belonged to him to the exclusion of anyone else was, quite frankly, overwhelming. And that once you get to the point that, yes, this was distributed, it's Voyager 837009. Do those family members have their own screen names and their own e-mail addresses? There was some evidence of that introduced at trial, Your Honor. And I would have to apologize. I didn't look at some of their other things. They all denied ever using any of those screen names. And I think there may have been some testimony. Frankly, I don't have a sufficient recollection of the record. I know the sister testified and others testified about what they did on the computer. He wasn't the only one that used the computer. He was not the only one who used the computer. He was the only one that there was any evidence about that he used those particular screen names. And in addition, in the chats that were under those screen names, there were identification lines or characteristics in those chats. For example, there were a couple in which he said, I'm a courier, or I deliver paperwork. And, in fact, there was other evidence that showed at that period of time he worked for a mail and parcel drop company and was delivering various paperwork all over Boise and Ada County, that whole Treasure Valley area. There was one in which he said he had an older brother and a younger sister, and the brother was, in fact, older, and he testified, and the sister was, in fact, younger, and she testified and was visible to the jury. So even if there was not that other evidence that what were their screen names, the only evidence, again, of anyone using those screen names was the defendant, Chris Hewitt. And I think it's significant when, I mean, that's all evidence. There were some chats found on computers other than the defendant's specific computer. There were some chats found on the older brother's laptop. There were some chats found on a family computer. But all of the child pornography was found either on the defendant's Antec computer or on two external hard drives, which were seized from the vicinity of the Antec computer. And so I think there simply wasn't any evidence other than speculation that anyone else was responsible for any of the child pornography, either distributing it, receiving it, or possessing it. And I think, Your Honor, significantly, Mr. Charney, when he asked his court to reverse the convictions because of sufficiency of the evidence or prosecutorial misconduct, is talking only about counts one and two. Count one was distribution. Count two was receipt. Count three was the possession count. So he's not saying that either the sufficiency of the evidence or any of my comments at trial were sufficient to undermine the jury's verdict or cause prejudice on the possession count. And I do, Your Honor, want to address the court with respect to the allegations of prosecutorial misconduct or the claims that there were errors in statements that I made at the trial. And I would say, Your Honor, that, first of all, it's obviously an uncomfortable position to be in. I do appreciate Mr. Charney's comments in the brief that he thought that they were unintentional. I do appreciate that. And I would say, Your Honor, that of the three areas in which he's alleged there was prosecutorial misconduct, the closest case, and as I review the comments and look at the case law, that there was any error in the comments that I made in any prosecutorial misconduct, comes in the opening statement when I referred to Mr. Christofferson by name and said that he was seated at defense counsel table and then went on to say, I anticipated that the computer expert's testimony would be consistent with respect to the fact that there was child pornography on the computer and that whoever put it there was inside the house, that there was the absence of a hacker. And, Your Honor, as I look at that and have struggled with, is that error or not error? It's definitely too close to the line and something I should not have done. I'm an experienced prosecutor. I've been at this a long time. And it certainly did raise the specter, at least, that there was someone who had been hired by the defense to examine the computers. I think this case, even if that is considered error by this court, that it did not prejudice the defendant at all in this case. And part of that is because the substance of what the comments were, the anticipated evidence were. It was evidence that is consistent, was consistent with the government's case. And, in fact, one of the pieces of evidence was that the child pornography was on the defendant's computer. And that's not even anything that Mr. Charney is raising at this point as error. He is not saying that possession is an issue at all. So there couldn't have been any prejudice from that part of my statement at the trial, Your Honor. Counsel, let me just say I commend you for coming here to defend your activity at trial. Oftentimes, when there are allegations of prosecutorial misconduct, the prosecutor does not come. So I give you credit for coming here to defend your remarks. Thank you, Your Honor. And I guess I am going to... The thing that really was kind of somewhat problematical, from my perspective, was when you misstated whether you needed an app. What was it? Password. Password. Password. That was the only one that really... I'll address that then, Your Honor. I found the attempt in the brief to explain that somewhat confusing. Well, I think, you know, first of all, there are two different things that, frankly, Mr. Charney and I were talking about with respect to that. I mean, his argument at trial, I think, was different from mine. He was arguing that you didn't need a password, and I think this is correct, to go online, to go onto the Internet and look at the Yahoo Photos page. And that is what Ms. Beard said. And if you look, I think, at the exchange of questions, the question I posed to her initially was, when you went on to look at the Photos page, did you need a password to log in? And she said, no, not at all. And I think my argument in closing was, no, it was not a very clear statement, one way or the other. I think that's very apparent. But that to go on to the Photos page as, excuse me, to be online operating, to be online operating as Voyager or whatever, you need a password. And there was the use of the word password was definitely imprecise. I think, Your Honor, there was lots of evidence in the record that people who go on through Yahoo services and are operating online, for example, in this case it's Voyager 83709, that you need that ID. You need to go in and plug in, you know, like we all get on the computer and plug in our user ID and password. And then if you go on some Internet services, you need a login ID. And I think it was clear from the evidence in the case that to operate online, you needed to have at least a login ID to go on and use those services through Yahoo. If I didn't know someone's login ID, if I didn't know the screen name, I couldn't go on and pretend to be Voyager 83709. I guess it's no different from, you know, the Ninth Circuit has its own web page. And I looked at it last week to find out who was going to be on the panel and to make sure I was still coming to Portland. And it lists on there the rules. I can download rules. It lists the various court settings. It listed the calendar. It informed me who was going to be on the panel. But that didn't give me, and I didn't need a password or anything for that, but that did not give me the ability to go in and change any of the content of that website or to change who was going to be on the panel, where my position was. But on the other hand, I assume that there is someone who has to go in and do all that and likely does have to use a password and a login ID. And I think that those are the differences. And even, Your Honor, if the court concludes that that comment was a false statement, it was one really small part of the closing argument, and it didn't really even get to the heart of all of the evidence that showed that there had been a distribution. Even if someone did need a password and could add their own photos, it didn't touch the evidence that all 85 images were on the Antec computer first, and then those same 85 images are on Voyager's website. So even if the court does conclude that that's the troubling statement, I would submit that it was not prejudicial. And that's clearly looked at. I apologize, Your Honor, if I could just finish this statement. Go ahead, finish up. I'll give you another minute. You can address the search warrant for a minute, actually. And that if he – I lost my train of thought, but I got it. Even if it didn't address the fact that there had been the evidence on the Antec computer and then on the Voyager webpage, it didn't go to that at all. Your Honor, with respect to whether the search warrant established probable cause, I would submit that if you do take that, even if you conclude that that boilerplate on child collector characteristics is boilerplate and shouldn't be part of the search warrant, that it is pages 13 on in the search warrant that describe in detail what they found and what they saw on the Internet, and then the steps taken, the methodical steps taken to trace that back to a location in Boise, Idaho, on Seneca Drive and the fact that all of the subscriber ID information from various sources came back to that same house. And I think when you look at what is required and what Hay and Kelly make clear that this court is to do, even with the search warrant to look for computers, you look at is there a fair probability that you're going to find the computer that uploaded the child pornography from or to the Yahoo Photos webpage at that particular residence. And I don't think there has to be separate evidence about which computer it came from because we just know it came from that residence. And I think then that does give the searchers, the searching officers, the executing officers, the ability to take all of the computers that may have done that. Counsel asked you to request a stipulation on Council 3. Do you agree with the opposing counsel's proposal? I don't, Your Honor. Frankly, I would prefer that the court vacate the judgment and remand both back to the district court. Because I think that's also what the court did in Davenport and Gibbers and the other case, and that's what the government asked the court to do. And thank you for your time this morning. The strongest case I had, Your Honor, is United States v. Hill, which is cited in my brief. United States v. Hill. That is correct. 459-Fed3rd-966. The issue here is fair probability. And what we have, if we look through that one portion of the search warrant affidavit, are tips about messages that are coming in from all over the world. What was seen on the Yahoo page. Then we have an investigation leading to an IP address. And then quest saying that that IP address is associated with the home of David Hewitt. What I would suggest is in the absence of any other information, which is basically meaning the excised information, that there is simply not enough in pages 13 through 19 to take every single computer, peripheral, hard drive, every single thing located in the home. Counsel, can we go to Hill? Do you have a case? What language in Hill? Oh, I'm sorry. I don't have a case. I just cited the case. All I was saying is the general proposition stands for the general proposition with respect to search warrants is whether or not there is a fair probability that the evidence will be located based on the information that's presented to the magistrate. In Hill, the officer's affidavit only described two images from the defendant's computer as showing three different minor girls with their private areas exposed. And we found that that established a fair probability that there was child pornography or evidence thereof to be found at the defendant's home. At the home. True. But then the question is how big can the search warrant get? How much will the officers be allowed to get? Well, Hill doesn't support your argument. All right. May I have one extra minute to address the misconduct issue, if that would be acceptable? That's all. I'm sorry? That's it. One minute. Thank you. What I wanted to say on that is simply stated is that I have enjoyed a long, cordial, and very professional relationship with Ms. Olson. And with respect to making allegations of prosecutorial misconduct, they don't come easy. And I don't want the court to think that we had an ugly, nasty battle or that there's anything along those lines. No. All very professional. It was. And as I combed through the appellate record, I almost felt like that feeling you get when you know you have to fire somebody but you don't want to and the like. And so I just want the court to know that it was an issue to be raised on appeal. It was a fair issue. And just for the purpose of doing that, I just didn't want there to be any maligning or any thought that Ms. Olson had intentionally engaged in any misconduct because there is no such accusation. You had to raise it. It was an issue that you had to raise on behalf of your client, and we understand that. All right. I appreciate that because I didn't want the record to be anything other than that. Okay. Thank you for your time. Thank you. Our next case for argument is United States v. Holt.
judges: Paez, Rawlinson, Jenkins